UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JAMES FRUTIGER,

        Plaintiff,

  v.                                  Case No. 17-C-1114

DR. WILLIAM F. MCCREEDY,
DR. WILLIAM B. KELLEY,
& DR. BARBARA WEBER,

        Defendants.

---

**DECISION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT**

---

On August 11, 2017, Plaintiff James Frutiger, a prisoner currently serving a state sentence at Kettle Moraine Correctional Institution (KMCI), filed this *pro se* lawsuit pursuant to 42 U.S.C. § 1983, alleging that Defendants were deliberately indifferent to his serious medical needs—a rash—in violation of the Eighth Amendment. ECF No. 1. In March 2018, Defendants filed motions for summary judgment arguing their medical care of Frutiger was not deliberately indifferent. ECF Nos. 21, 27. These motions have been fully briefed. For the reasons expressed below, Defendants' motions for summary judgment will be granted and the case will be dismissed.

### I. CIVIL LOCAL RULE 56

Before I turn to the facts of this case, I must first address Defendants' argument that Frutiger has failed to properly respond to their proposed findings of fact, pursuant to Civil Local Rule 56(b)(2)(B), and their subsequent requests that all their facts be deemed admitted as uncontroverted for the purpose of summary judgment under Civil Local Rule 56(b)(4). *See* Weber's Reply Brief in Supp., ECF No. 41 at 1; State Defs.' Reply Brief in Supp., ECF No. 43 at 1. Rather than respond

to Defendants' proposed findings of fact, Frutiger responded that Defendants' findings of facts were "inconsistent" with facts he set forth in reply to their affidavits, thus summary judgment should be denied. Pl.'s Resp. to PFOF, ECF Nos. 35-1, 38. Frutiger also filed responses to the portions of Defendants' affidavits that he disagreed with. Pl.'s Resp. to Affs., ECF Nos. 36, 39, 40. Frutiger's responses were not factual disputes, but rather disputes about how he interpreted the facts discussed in each affidavit. *See, e.g.*, ECF No. 35 at 2 ("She says that I stated my rash was likely an allergic reaction because I've previously experienced allergic skin reaction to laundry soaps and fabric softeners. I don't recall saying that. I remember telling her that I tried different deodorant, bars of soap . . ."); ECF No. 39 at 1 ("How can he say that he is not deliberate[ly] indifferent if he reviewed the records?"); ECF No. 40 at 1 ("Dr. Kelley states there was no rash or bumps noted. Why would they give me anti-fungal cream?").

Under Federal Rule of Civil Procedure 56, a party asserting a factual dispute must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). A court may rigorously enforce compliance with its local rules governing summary judgment. *See, e.g.*, *Stevo v. Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011).

Because Frutiger is proceeding *pro se*, I will construe what he has filed as favorably as the record and Local Rule 56 allow. Although Frutiger has offered no affidavits or declarations, he has submitted copies of his medical records, Health Service Request (HSRs), and Inmate Requests. *See* ECF Nos. 1-1; 1-2; 1-3; 1-4; 1-5; 1-6; 36-1. Thus, to the extent Frutiger's disputes are supported by the record or Frutiger could properly testify to the matter asserted, the fact will be considered

2

disputed. However, to the extent that Frutiger's "disputes" are unsupported by the record, I will deem these facts admitted for the purpose of deciding summary judgment. *See* Civil L.R. 56(b)(4).

On June 20, 2018, Frutiger filed a letter requesting to amend his responses to the proposed findings of fact because he was not aware that he had "messed it up" until he read Defendants' reply briefs. ECF No. 44. This letter, however, was sent over six weeks after Defendants filed their reply briefs, and Frutiger gives no explanation for the delay. Additionally, Frutiger failed to reproduce the entire findings of fact as amended, which the Civil Local Rules require when moving to amend, or even to explain what changes he would make or what he would do differently. *See* Civil L.R. 15.

I find that granting Frutiger leave to amend his findings of facts would be prejudicial to Defendants because Frutiger waited over six weeks to ask for leave to amend. It would also require briefing to be reopened on two motions that were fully briefed, increasing the costs to all parties and delaying the ultimate resolution of the case. Despite Frutiger's allegation that he was unaware he needed to submit findings of fact, I note that Frutiger received copies of Civil Local Rule 56 from both Defendants, which detailed the process for presenting and responding to Defendants' proposed facts. ECF No. 21, 27. Therefore, Frutiger's request to amend his findings of facts is denied. With that in mind, I now turn to the material facts.

## II. BACKGROUND

### A. Frutiger's Medical Treatment

Frutiger was an inmate at KMCI during all relevant times. State Defs.' Proposed Findings of Fact (SDPFOF), ECF No. 29, at ¶ 1. Dr. William Kelley is a physician at KMCI. *Id*. at ¶ 2. Dr. McCreedy is the health services manager at KMCI. *Id*. at ¶ 3. As health services manager, Dr.

McCreedy does not regularly or routinely provide direct treatment to inmates and did not provide direct medical treatment to Frutiger at any point. *Id*. at ¶¶ 6–7. Dr. Kelley and Dr. McCreedy are employed by the Wisconsin Department of Corrections. Dr. Barbara Weber is a *locum tenens* physician with LT Medical, LLC and provides contract services to clients of LT Medical. Webers' Proposed Findings of Fact (WPFOF), ECF No. 23 at ¶¶ 1–2. As *locum tenens* physician, she was assigned to provide contract physician services at KMCI from November 21, 2016, until shortly after March 7, 2017, when she was transferred to another state prison. *Id*. at ¶¶ 3–4, 50.

On May 12, 2016, Frutiger was transferred to KMCI. SDPFOF at ¶ 10. A KMCI nurse conducted a transfer screening and no significant medical illnesses were discussed. *Id*. On July 12, 2016, Frutiger submitted an HSR complaining of an itchy and dry scalp and mustache. *Id*. at ¶ 11. He also noted that he thought he had bites or something that itched on his leg. *Id*. at ¶ 12. On July 13, 2016, a nurse saw Frutiger about his HSR and noted that Frutiger had a reddened area on his upper lip and mustache and that he had scattered red spots on his lower extremities, which appeared to be small papules that had been scratched open. *Id*. at ¶ 14. Frutiger was given dry scalp shampoo, anti-itch location, and ointment. *Id*. at ¶ 15. The nurse advised Frutiger to keep his fingernails short to avoid scratching and to increase his water consumption. *Id*. at ¶ 16. Frutiger made no further complaints about itching until September. *Id*. at ¶ 18.

On September 18, 2016, Frutiger submitted an HSR complaining that his rash was getting worse. *Id*. at ¶ 18. The following day, Frutiger was seen by nursing staff, received hydrocortisone, and was scheduled to be seen by the physician. *Id*. at ¶ 20. On September 28, 2016, Frutiger submitted another HSR asking to be seen again about his rash and complaining that the anti-itch creams were not working. *Id*. at ¶ 21. On September 29, 2016, Dr. Kelley met with Frutiger to

address his rash complaint. During the examination, Dr. Kelley noted that Frutiger had tiny water vesicles that itched on his feet, extremities, abdomen, and upper lip. *Id*. at ¶ 23. Dr. Kelley observed that, while the rash was similar to scabies, the spacing between the affected areas seemed too far apart to be scabies, since scabies usually appear in a linear fashion, approximately one millimeter or two apart. *Id*. at ¶¶ 24–25. As a result, Dr. Kelley believed the rash was not scabies, but rather a non-specific eczematoid rash of the trunk and extremities. *Id*. at ¶¶ 26, 28. Dr. Kelley continued the anti-itch shampoo and conditioner and prescribed a steroid cream for the rash. *Id*. at ¶ 30. He also ordered selenium sulfide lotion 2.5% to treat Frutiger's itchy, dry scalp. *Id*. at ¶ 33.

On October 16, 2016, Frutiger submitted another HSR asking to be seen by the doctor for his rash. *Id*. at ¶ 35. A nurse saw Frutiger the next day and recorded no indication of a rash or bumps. *Id*. at ¶ 36. The nurse noted, instead, that Frutiger had significant redness from itching and that Frutiger reported he was sweating a lot. Frutiger was given an anti-fungal cream to use until a physician could see him. *Id*. at ¶¶ 36–37. On October 22, 2016, another nurse saw Frutiger about his rash, which Frutiger suspected was related to a new medication, Lamotrigine, that he began in June. *Id*. at ¶ 38. The nurse noted that Frutiger's rash was not getting worse and that he remained on the list to be seen by a physician for evaluation. *Id*. at ¶ 39. On October 25, 2016, Dr. Syed saw Frutiger for his rash complaints. *Id*. at ¶ 40. Dr. Syed noted Frutiger had only a couple of small bumps that appeared to be folliculitis or mosquito bites. *Id*. at ¶ 42.

In October 2016, Dr. Kelley went on medical leave and Dr. Weber took over as Frutiger's primary treatment provider. *Id*. at ¶ 44. On November 23, 2016, Dr. Weber saw Frutiger for his continued complaints of a rash. WPFOF at ¶ 17. Frutiger complained of an itchy rash and reported he had tried a variety of skin creams unsuccessfully. *Id*. at ¶¶ 17–18. Dr. Weber examined Frutiger

5

and noted "excoriated eschars and pustules." *Id*. at ¶ 20. She subsequently diagnosed Frutiger with a "generalized overall pruritic rash consistent with scabies," and prescribed a two-week dose of Permethrin cream, a scabies treatment, and hydroxyzine cream. *Id*. at ¶¶ 21–22, 24.

On November 29, 2016, Dr. Weber saw Frutiger again to address his itchy skin, his request to see a dermatologist, as well as his complaints of back pain and itchy eyes. *Id*. at ¶ 28. Dr. Weber physically examined Frutiger and determined that because he had not yet completed his prescribed scabies treatment, he was not an appropriate candidate for referral to an outside dermatologist. *Id*. at ¶¶ 29, 31.

On December 12, 2016, Frutiger filed another HSR about his rash. SDPFOF at ¶ 57. Frutiger was seen by nursing staff, who observed evidence of red raised bumps, which were irritated from scratching in some areas. *Id*. at ¶ 58. On December 16, 2016, Dr. Weber saw Frutiger again primarily for back pain. WPFOF at ¶¶ 33, 35. Dr. Weber took a medical history from Frutiger and performed a physical examination. *Id*. at ¶ 34. Frutiger did not request a dermatologist referral at this appointment. *Id*. at ¶ 36. Dr. Weber observed "small pin point excoriation sparsely scattered on legs, feet, arms and torso," which were consistent with fingernail scratch marks. *Id*. at ¶ 37. Even though Dr. Weber spotted the scratch marks, the examination did not reveal any rash or physical presentation that was similar to the rash she observed before Frutiger began scabies treatment. *Id*. at ¶ 38. Frutiger suggested that the residual itching may be due to an allergic reaction. *Id*. at ¶ 36. Because there were no objective signs of a skin condition meriting referral, Dr. Weber did not believe a referral to an outside dermatologist was appropriate. *Id*. at ¶ 39.

On March 3, 2017, Frutiger filed an HSR asking Dr. Weber to send him to a dermatologist. SDPFOF at ¶ 64. Dr. Weber saw Frutiger on March 7, 2017, to address Frutiger's request for pain

medication for his back. WPFOF at ¶ 44. During his physical examination, Dr. Weber did not observe an objectively appreciable rash. Instead, she noted sparsely-scattered excoriated papules similar to what she had observed at the December 12 visit, but inconsistent to the rash Frutiger presented with on November 23. *Id.* at ¶ 46. Frutiger again reported that his rash "comes and goes," but that the rash was good right now compared to previous times. *Id.* at ¶ 45. Because Dr. Weber observed no appreciable rash, and Frutiger reported the rash was fine, Dr. Weber found that Frutiger was not an appropriate candidate for a dermatology referral. *Id.* at ¶ 48. This was the last time Dr. Weber treated Frutiger. *Id.* at ¶ 49.

On April 19, 2017, Dr. Kelley saw Frutiger for complaints of back pain and his continued rash. SDPFOF at ¶ 69. Dr. Kelley noted that, during his physical examination, Frutiger picked at his hands and rubbed his hands through his hair. *Id.* at ¶ 74. Dr. Kelley continued Frutiger's prescription of selenium sulfide lotion for the itching. *Id.* at ¶ 75. On May 3, 2017, Frutiger filed an HSR requesting to be seen by staff. When he was seen by the nurse, Frutiger requested a referral to a dermatologist for his rash. *Id.* at ¶ 77. The nurse asked if Frutiger used the selenium sulfide lotion, and Frutiger responded that he did not. *Id.* at ¶ 78. The nurse instructed him to follow the directions provided for the lotion. *Id.* at ¶ 79.

On July 6, 2017, Dr. Kelley saw Frutiger again for his skin. *Id.* at ¶ 80. Dr. Kelley noted that Frutiger had an unsuccessful scabies treatment and that the skin lesions were most prominent on Frutiger's feet. *Id.* at ¶¶ 80–82. Based on his physical examination, Dr. Kelley believed the itchy skin could have been caused by a possible fungus, such as athlete's foot, or contact dermatitis. *Id.* at ¶¶ 84–85. He prescribed Frutiger a foot fungal cream to address the issue. *Id.* at ¶ 86.

On August 8 and October 11, 2017, Dr. Kelley saw Frutiger for back complaints and to review an MRI, respectively. Frutiger did not raise any dermatological issues at either appointment. *Id*. at ¶¶ 87–89. Dr. Kelley noted Frutiger continued to pick at his skin during these visits. *Id*. at ¶ 90.

On November 15, 2017, Dr. Kelley met with Frutiger about the dermatological issues. Frutiger reported that the rash was comprised of nodules that tended to arise under the skin and seeped when he scratched them open. *Id*. at ¶¶ 91–92. Frutiger reported that hydroxyzine helped but did not solve the problem. *Id*. at ¶ 93. Dr. Kelley concluded Frutiger was now an appropriate candidate for a dermatologist referral, as none of the conservative treatments had worked and the scabies treatment was unsuccessful. *Id*. at ¶ 94. Dr. Kelley was concerned Frutiger had Prurigo Nodularis, Picker's disease, or some other type of neurodermatitis. *Id*. at ¶ 95.

On December 21, 2017, Frutiger saw Dr. James Schuster at the Fond du Lac Regional Dermatology Clinic. *Id*. at ¶ 96. Dr. Schuster noted a variety of treatments had been tried unsuccessfully and performed a skin scraping, which revealed scabies microscopically and clinically. *Id*. at ¶¶ 97–98. Dr. Schuster recommended three doses of permethrin cream and a single dose of invermectin, which was implemented by Dr. Kelley. *Id*. at ¶ 100. Dr. Kelley ordered another follow up visit with Dr. Schuster, which occurred on January 23, 2018. *Id*. at ¶ 102. Dr. Schuster noted that while the skin was improved the rash was not gone. Dr. Schuster noted Frutiger had excoriations on his face, scalp, trunk, and extremities with a few pustules on his back. *Id*. at ¶ 103. Dr. Schuster suspected the pustules were from folliculitis, but ordered another dose of permethrin and invermectin to eliminate any remaining possibility of scabies. *Id*. at ¶¶ 103–04.

**B. Frutiger's Complaints to Dr. McCreedy**

Frutiger complained about the treatment he received from Drs. Weber and Kelley to the HSU manager, Dr. McCreedy, primarily through information and interview request forms. On January 18 and 21, 2017, Frutiger filed information and interview requests stating he had asked Dr. Weber for a skin biopsy or dermatology appointment, but that Dr. Weber indicated nothing more could be done. *Id*. at ¶ 110. Dr. McCreedy responded that Frutiger's physician had made a medical determination about what the appropriate treatment was, but if Frutiger's condition changed, he could request a sick call appointment for reevaluation. *Id*. On February 24, Frutiger filed an information and interview request, alleging a conflict of interest with Dr. Weber and asking to be switched physicians. *Id*. at ¶ 111. Dr. McCreedy reviewed Frutiger's medical file, found no conflict of interest, and informed Frutiger that there was no medical reason to switch physicians. *Id*.

On April 22, 2017, Frutiger filed another information and interview request concerning an unpleasant interaction that arose when Frutiger tried to bring up several medical issues to Dr. Kelley that were unrelated to the medical reason the appointment was scheduled for. *Id*. at ¶¶ 113–14. Dr. McCreedy reviewed Frutiger's medical records and explained that the protocol required staff to only address the medical problem identified in the HSR because addressing unidentified medical issues caused delays in the physician's schedule. *Id*. Dr. McCreedy advised Frutiger to request an additional sick call so that medical staff could address any additional medical concerns. *Id*. at ¶ 115. Lastly, Frutiger filed an interview and information request in May 2017, asking to be sent to a dermatologist. *Id*. at ¶ 120. Dr. McCreedy responded that this request would need to be considered by a physician and advised Frutiger to submit a request for a sick call. *Id*.

### III. LEGAL STANDARD

Under the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

"At the summary judgment stage, the facts must be viewed in the light most favorable to the nonmoving party only if there is 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). However, "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record is taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (citing

*Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)). The court is not required to search through the record to make an argument on behalf of a party. *See Corley v. Rosewood Care Ctr.*, 388 F.3d 990, 1001 (7th Cir. 2004) (citing *Albrechtson v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) ("Judges are not like pigs, hunting for truffles buried in the record.")). Therefore, "the party bearing the burden of proof on an issue may not simply rest on its pleadings, but must affirmatively demonstrate, by specific factual showings, that there is a genuine issue of material fact requiring trial." *First Nat'l Bank v. Lewco Sec. Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252.

## IV. ANALYSIS

### A. Deliberate Indifference Standard

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. It imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official's "deliberate indifference" to a prisoner's medical needs or to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828; *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). This does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. An inmate's claim for deliberate indifference must establish "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012). A plaintiff who complains that a "delay in medical treatment rose to a constitutional

violation must place verifying medical evidence in the record to establish the detrimental effect of delay in a medical treatment to succeed." *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

Thus, for the first element, Frutiger must show that he had an objectively serious medical condition. Then, for the second element, Frutiger must show that each state official was subjectively deliberately indifferent to that serious medical condition. Stated another way, Frutiger must show that each "defendant had actual knowledge of impending harm which he consciously refused to prevent." *Hill v. Shobe*, 93 F.3d 418, 421 (7th Cir. 1996).

Deliberate indifference is a high standard. Ordinary negligence, or even gross negligence, is not sufficient to establish deliberate indifference. *McGill v. Duckworth*, 944 F.2d 344, 348 (7th Cir. 1991). "Mere differences in opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). "[D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id*. at 261–62.

## B. Dr. Weber

Frutiger asserts Dr. Weber was deliberately indifferent in her overall treatment of him and for failing to refer him to a dermatologist. Frutiger's assertion that Dr. Weber was deliberately indifferent because she refused to send him to a dermatologist fails as a matter of law. Inmates have no constitutional right to dictate the course of treatment they receive, such as whether to be seen by a specialist. *Jackson v. Kotter*, 541 F.3d 688, 697–98 (7th Cir. 2008). Dr. Weber refused to refer Frutiger to a specialist because, after her multiple physical examinations of him, she found no

medical reason warranted a referral. By Frutiger's own account, his condition changed over time. At times it improved, and at other times it became more symptomatic. Dr. Weber did not ignore his complaints; she continued to try different therapies in an effort to provide him relief. Frutiger offers no evidence that Dr. Weber's medical decision was wrong or inappropriate or beyond reasonable standards of care. Instead, he challenges her refusal to give in to his demands to see a dermatologist. But disagreement with her medical decision is insufficient to establish a deliberate indifference claim. *Estate of Cole by Pardue*, 94 F.3d at 261 ("Mere differences in opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference.").

Frutiger argues that Dr. Weber should have known to send him to a dermatologist because he was ultimately diagnosed with scabies. However, Dr. Weber treated Frutiger in October 2016 through March 2017. Frutiger was not ultimately diagnosed with scabies until December 2017. Frutiger offers no evidence that he had scabies while Dr. Weber was treating him. Instead, the only evidence in the record suggests otherwise, as Dr. Weber ordered him a scabies treatment in November 2016 that was ultimately unsuccessful. There is no indication that Dr. Weber was aware that Frutiger may have had scabies. Therefore, her medical decision to treat his rash without referring him to a dermatologist was not deliberately indifferent.

Lastly, Frutiger points to Dr. Weber's statement that there was nothing more she could do as deliberate indifference. However, the Court must analyze Dr. Weber's treatment of Frutiger as a whole. *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997) ("[W]e must examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs."). When Dr. Weber responded there was no further treatment, she had

physically examined Frutiger and noticed no appearances of a rash; instead, she noted only physical markings that appeared to be fingernail scratches. The lack of noticeable rash was also noted by a nurse in the following weeks. Frutiger, himself, suggested that the rash was caused by an allergic reaction. Dr. Weber's medical opinion that the rash was an allergic reaction and no further treatment was needed or available was a medical decision. At most, Dr. Weber's failure to recognize the rash as something more would amount to medical malpractice. Medical malpractice, however, is not deliberate indifference. *McGill*, 944 F.2d at 348.

In addition, Dr. Weber did not refuse to treat Frutiger after she made the statement. Instead, she continued to treat Frutiger and saw him again in March 2017 to try to resolve the rash. During the March 2017 visit, Frutiger remarked that the rash was doing well at that time compared to what it had been in the past. In total, Dr. Weber saw Frutiger four times over her almost five month employment at KMCI. During that time, she ordered scabies treatment. After the treatment was performed, she observed no physical appearances of a rash and concluded the itching was from an allergic reaction. In order for a medical professional to be liable for deliberate indifference to an inmate's medical needs, she must make a decision that is "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such judgment." *Jackson*, 541 F.3d at 698 (citation omitted). As such, a "medical professional's treatment decisions will be accorded deference 'unless "no minimally competent professional would have so responded under those circumstances."'" *Id*. (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)).

Frutiger has offered no evidence that Dr. Weber's treatment was a departure from any accepted professional judgment, or that no minimally competent professional would have responded

14

likewise. In fact, the evidence submitted shows that Dr. Schuster ultimately treated Frutiger with the same treatment that Dr. Weber prescribed—permethrin cream. Even after Frutiger underwent Dr. Schuster's prescribed treatment, the rash continued, and Dr. Schuster believed the rash was likely folliculitis, not scabies. Given this evidence, no rational factfinder could conclude Dr. Weber was deliberately indifferent because there is no evidence that her prescribed treatment was a substantial departure from accepted medical judgment.

**C. Dr. Kelley**

Frutiger asserts Dr. Kelley was also deliberately indifferent in his treatment. Dr. Kelley saw Frutiger once in September 2016 when Frutiger first complained of his rash. Dr. Kelley diagnosed Frutiger's condition as a non-specific eczematoid rash because he believed the marks were too far apart to be scabies. Based on this diagnosis, Dr. Kelley prescribed a steroid cream and selenium sulfide 2.5% lotion. Even if Dr. Kelley was wrong in his diagnosis, Frutiger has offered no evidence that this was anything more than a mis-diagnosis, which rises to the level of medical malpractice, not deliberate indifference. *McGill*, 944 F.2d at 348 (explaining that neither medical malpractice nor negligence is sufficient to state a claim for deliberate indifference). Nor has he offered any evidence that this treatment was inappropriate or a substantial departure from professional judgment. Nothing in his initial treatment of Frutiger supports a claim that he was deliberately indifferent to his condition. Shortly thereafter, Dr. Kelley left the institution.

When Dr. Kelley returned, Frutiger alleges his treatment was deliberately indifferent because he underwent a variety of different treatments that had already been tried and were unsuccessful, including a variety of lotions, creams, hydrocortisone, and anti-fungal creams. Essentially Frutiger's argument is that Dr. Kelley was deliberately indifferent because the treatments did not work and

15

because he failed to diagnose scabies or refer him to a dermatologist earlier. As already noted, Frutiger's disagreement with Dr. Kelley's course of treatment, alone, is insufficient to establish a claim of deliberate indifference. Rather, Frutiger needed to adduce evidence that Dr. Kelley's treatment was a substantial departure from medical judgment, and he has failed to do so. Frutiger argues that his ultimate diagnosis of scabies shows that Dr. Kelley was deliberately indifferent in his treatment of Frutiger. But Frutiger had already undergone scabies treatment that was unsuccessful in treating his condition. Given that history, it is not unreasonable for Dr. Kelley to suspect that there was another cause of Frutiger's rash. Dr. Kelley's attempts to treat Frutiger's rash through a variety of methods was reasonable, and Frutiger has offered no evidence that it was inappropriate or a substantial departure from professional judgment. For these reasons, Frutiger's claim against Dr. Kelley also fails.

**D. Dr. McCreedy**

Frutiger asserts Dr. McCreedy was deliberately indifferent to his rash because McCreedy failed to intervene despite Frutiger's repeated complaints about the treatment he received. This claim also fails for several reasons. First, Frutiger has offered no evidence that Dr. McCreedy had subjective knowledge that Frutiger had a serious medical condition. Although, Frutiger did repeatedly complain of an itchy rash, Frutiger's interview requests did not complain of anything more serious than a rash and did not indicate that he suspected the rash was scabies. Dr. McCreedy never physically examined Frutiger. While Frutiger was ultimately diagnosed with scabies, which assuming for argument's purpose is a serious medical condition, there is no evidence that Dr. McCreedy had any subjective knowledge that Frutiger had such a condition.

16

Second, Frutiger offers no evidence that Dr. McCreedy was deliberately indifferent to Frutiger's complaints. Dr. McCreedy responded to each request, reviewed Frutiger's medical records, and deferred to Frutiger's treating physicians' treatment plans. Frutiger has offered no evidence that Dr. McCreedy "had actual knowledge of impending harm which he consciously refused to prevent." *Hill*, 93 F.3d at 421. At most, Frutiger offers evidence that Dr. McCreedy investigated and responded to Frutiger's requests, but that Frutiger disagreed with Dr. McCreedy's responses. Frutiger's mere disagreement is insufficient to establish that Dr. McCreedy was deliberately indifferent.

### IV. CONCLUSION

In sum, Frutiger has failed to offer evidence on which a reasonable jury could find that any of the defendants were deliberately indifferent to his serious medical needs. The State Defendants' motion for summary judgment (ECF No. 27) and Weber's motion for summary judgment (ECF No. 21) are therefore **GRANTED** and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this __28th__ day of December, 2018.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
